## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Criminal No. 2017-0015** |
| | ) | |
| **DION WILLIAMS, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗ | ) | |

**Attorneys:**
**Rhonda Williams-Henry, Esq.,**
St. Croix, U.S.V.I.
    *For the United States*

**Yohana Manning, Esq.,**
St. Croix, U.S.V.I.
    *For Defendant Dion Williams*

## <u>MEMORANDUM OPINION</u>

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant Dion Williams' "Motion to Suppress" (Dkt. No. 28) ("Motion") and "Omnibus Motion to Suppress Evidence and Statements" ("Omnibus Motion") (Dkt. No. 26); the Government's "Opposition to Motion to Suppress" (Dkt. No. 31); testimony at the suppression hearing held on July 13, 2018; Defendant's supplemental briefing filed on July 25, 2018 (Dkt. No. 94); and the Government's supplemental response filed on August 18, 2018 (Dkt. No. 96). For the following reasons, the Court will deny Defendant's Motion to Suppress.

## I.      BACKGROUND

On April 10, 2017, the Government filed an Information against Defendant Dion Williams ("Williams") and Co-Defendant Dasha Greyham ("Greyham") charging them each with one count

of Possession with Intent to Distribute Marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D). (Dkt. No. 19 at 1).[1]

At the suppression hearing, the Government offered the testimony of Federal Protective Service ("FPS") Agent Richard Cardona ("Agent Cardona") and also introduced several exhibits. Williams testified on his own behalf. The following facts emerged from the record established at the suppression hearing.[2]

Agent Cardona testified that, on March 10, 2017, at approximately 9:30 a.m., he was inside the control room at the Almeric L. Christian Federal Building and Courthouse ("Federal Building"), when he observed a black BMW approach the entrance of the secured parking lot in front of the Federal Building. The vehicle came to a stop and, via the intercom, the driver requested access to the secured parking lot. According to Agent Cardona, FPS denied entrance and instructed the driver—who later identified himself as Greyham—to park in the visitors' parking lot. Greyham refused to comply and allegedly caused a disturbance, shouting obscenities and demanding to be allowed into the secured parking lot to drop off his paperwork with the Court. Agent Cardona—who was watching the incident over the monitors—described the vehicle as blocking the driveway of the secured parking lot.

Agent Cardona testified that, after deciding to investigate the matter, he approached the vehicle and detected a strong odor of marijuana emanating from the vehicle. Williams, who Agent

---

[1] In the Information, Greyham was also charged with Felon in Possession of a Firearm in violation of 18 U.S.C. §§ 922(g) and 924(a)(2). (Dkt. No. 19 at 2). Prior to the Information, the Government commenced this action by filing a Criminal Complaint on March 10, 2017. (Dkt. No. 1).

[2] The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant Williams is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

Cardona identified in Court, was a passenger in the vehicle.

Upon contact with Defendants, Agent Cardona stated that he identified himself as a law enforcement officer and asked Greyham several times for his license, registration, and car insurance, and also the purpose of his visit. Greyham refused to comply with the requests for the identification materials, but handed Agent Cardona paperwork which Greyham said he needed to drop off with the Court. Agent Cardona testified that he asked Greyham if there was any contraband in the vehicle—specifically marijuana—and Greyham stated there was some. Agent Cardona also asked Greyham to turn off the car's engine, but he refused to comply. Williams eventually reached over and turned off the engine.

Agent Cardona testified that he then asked Greyham to exit the vehicle and patted him down for weapons. Agent Cardona asked Greyham where the contraband was located, and Greyham stated it was in the center console.

Agent Cardona testified that, following this exchange, he handcuffed Greyham and led him to sit near the vehicle, and backup FPS Officer Benjamin Martel arrived on the scene. Agent Cardona instructed Officer Martel to have Williams exit the passenger side of the vehicle while Agent Cardona searched the car for contraband.

Agent Cardona described seeing a marijuana joint in the center console of the vehicle in plain view and he showed it to Greyham, who stated "that's not it man." Greyham told him to lift the center console where Agent Cardona found a bag of vials containing a green leafy substance that he identified—based on his training and experience—as marijuana packaged for sale and distribution. Agent Cardona testified that the substance did in fact later test positive for marijuana. Photographic evidence of this substance was admitted into evidence at the suppression hearing.

Agent Cardona testified that, after finding the substance in the center console, he placed Greyham under arrest and ordered Officer Martel to do the same with Williams. According to Agent Cardona, while Officer Martel searched Williams, he observed Officer Martel retrieve several items from Williams' person, including a small bag containing a green leafy substance which also later tested positive for marijuana. Photographic evidence of this substance was also admitted into evidence at the suppression hearing.

According to Agent Cardona, both Defendants were then transported to a detention cell in the Federal Building. Agent Cardona interviewed Williams later that day, around 1:00 p.m. Between the time of Defendants' arrest and Williams' interview at 1:00 p.m., Agent Cardona stated that he conducted further investigation into the matter, including identifying and tracking down the owner of the vehicle and conducting an inventory of the vehicle.

Agent Cardona testified that before he questioned Williams, he provided him with a form called "Miranda Statement of Rights" ("*Miranda* waiver"), which he read to Williams and asked him to read it for himself. Agent Cardona further testified that Williams appeared to understand what was being said to him and indicated that he understood his *Miranda* rights by placing his initials at the beginning of each sentence, including those which confirmed that he waived his rights and was willing to speak with Agent Cardona.

A copy of the *Miranda* waiver was admitted into evidence during the suppression hearing, reflecting that Williams and Agent Cardona signed it around 1:19 p.m. Government Ex. No. 1. Corroborating the testimony of Agent Cardona, the form reveals that Williams' initials appear before each sentence of the *Miranda* warnings. *Id*. In addition, Williams' initials appear at the beginning of each of the following two questions in "The Waiver" section of the form, which end with the handwritten answer "Yes:" (1) "Do you understand your rights? and (2) Are you willing

to waive these rights and talk to me?" *Id.* Further, a section of the form titled "Waiver of Rights," under which appears Williams' signature, states as follows:

> I have been explained [sic] of my rights, and/or I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not request an attorney at this time. I understand and know the consequences of what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

*Id.*

Agent Cardona testified that, upon signing the *Miranda* waiver and agreeing to answer questions, Williams told him he was unemployed, had no source of income, and that he was a drug user, specifically using marijuana. Williams also stated he was in the car with Greyham because he was going to the Pueblo supermarket. According to Agent Cardona, Williams admitted that the controlled substance found in the center console was his and that he had previously purchased the marijuana for $100 the night before in the west end of St. Croix.

During his testimony, Agent Cardona stated that he also provided Williams with a form called "Consent to Search Form for Telephone" ("Consent Form"), so that his cell phone could be examined. Agent Cardona testified that, just as with the *Miranda* waiver, he read the Consent Form to Williams and asked him to read it for himself. Williams signed the Consent Form and provided his password by drawing it on the form. A copy of the signed Consent Form was admitted into evidence at the suppression hearing, reflecting that Williams signed it around 1:53 p.m. Government Ex. No. 2. In addition to affirming that the signatory granted consent to the search of a mobile phone(s), the signatory to the Consent Form also affirms that:

> I understand that I have the right to refuse the consent to search described above and to refuse to sign this form. I further state that no promises, threats, force, physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search of the mobile telephone(s).

*Id.*

Agent Cardona testified that two other individuals, Drug Enforcement Administration ("DEA") Special Agents DiFranco and Jane Cornwell, were present when he provided Williams with the forms and when he conducted the interview. Agent Cardona also stated that Williams was not handcuffed during the interview and that it took place in a conference room in a professional atmosphere. None of the officers in the room had their guns drawn; Williams was not forced to answer questions; and no one shouted or physically punished Williams. According to Agent Cardona, Williams did not appear nervous when he spoke with them and he never indicated that he did not understand what was going on. During cross-examination, Agent Cardona stated that he did not recall Williams asking if he had to sign the documents. Agent Cardona specifically denied telling Williams that if he did not sign either the *Miranda* waiver or Consent Form, he would be sent to jail.

Williams testified on his own behalf at the suppression hearing. His account of events leading to his and Greyham's arrest contained similar details as Agent Cardona's testimony. However, Williams provided additional details regarding the post-arrest period, and his description of the interview diverged from Agent Cardona's recounting of events.

Williams testified that after he was taken into custody, he was brought into a waiting cell in the Federal Building. He stated that sometime later he was taken out of the cell to speak with a probation officer with Pretrial Services. After his interview with Pretrial Services, Williams reported that he was returned to the holding cell.

Williams further testified that he encountered several law enforcement officers—none of whom he identified as Agent Cardona—who escorted him in and out of the waiting cell to Pretrial Services and then transported him downstairs for his interview. Williams stated that while he was

in the waiting cell, he had shackles on his feet, and when he was transported to be interviewed, he had restraints on his hands and feet.

According to Williams, he was taken to a room, where he waited alone for about 10-15 minutes. Two male officers then took him to another room. Just before he entered that room, the officers removed his restraints. The officers did not tell him where he was going, and he did not ask them what was happening.

Williams stated that, upon entering the adjacent room, a female and two male individuals were already present, all of whom identified themselves as law enforcement officials. Williams reported not remembering any of their names.

Williams testified that he was presented with the *Miranda* waiver and that it was explained to him. However, Williams stated that, before signing the document, he asked whether it was "mandatory" to sign the document and was told by a male officer, who was present at his interview, "yes, if I don't do it, I would be taken to jail." When asked who said that to him, Williams stated, "I never saw him before," and he did not remember which officer it was.

Williams reported that he also asked the same question when he was presented with the Consent Form to search his phone. Once again, Williams said the same male officer told him that he had to sign or he would go to jail, which is why he signed the Consent Form and provided his password. Williams testified that, during the interview, he did not ask for a lawyer at any point, although he knew he had a right to a lawyer. When asked why he did not ask for a lawyer, Williams answered that he did not have one.[3]

On cross-examination, Williams testified that he could not remember who read him the

---

[3]  On the *Miranda* waiver form, Williams' initials appear next to each of the *Miranda* warnings, including the sentence which states that if he could not afford a lawyer, one would be appointed for him prior to any questioning. *See* Government Ex. No. 1.

*Miranda* waiver and Consent Form, or whether the officer who discussed the forms with him was sitting next to him, or whether the officer who discussed the forms with him was the same officer who signed off on the forms. While Williams acknowledged that the forms were read to him and that he read the forms himself, he stated that he signed them only out of fear, because he was told that if he did not do so, he would go to jail. Williams testified that he signed the forms although he "did not understand everything on the paper" and that he only understood "certain parts of it," but also stated that he was not "forced" to sign the papers and confirmed that he never told anyone he did not understand what was going on. Finally, Williams testified that he had never been arrested prior to this incident, and that he was 18 years old at the time. Williams also testified that he never graduated from high school or completed a job corps program.

At the conclusion of the suppression hearing, the Court ordered supplemental briefing, directing the parties to incorporate into their legal arguments the evidence presented. (Dkt. Nos. 91 and 93). Pursuant to the Order, Williams and the Government filed their supplemental briefing on July 25, 2018 and August 18, 2018, respectively. (Dkt. Nos. 94 and 96).

## II.    APPLICABLE LEGAL PRINCIPLES

The Fifth Amendment's Self-Incrimination Clause provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. The "procedural safeguards"—commonly known as *Miranda* warnings—require that a suspect be advised prior to questioning that:

> [H]e has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he

cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Alston v. Redman*, 34 F.3d 1237, 1242 (3d Cir. 1994) (quoting *Miranda*, 384 U.S. at 479).

*Miranda* warnings are required whenever a suspect has been (1) "taken into custody" and (2) subject to "interrogation" by the Government. *Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir. 1974); *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (plurality opinion). A suspect is "in custody" when "'there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)) (internal quotation marks omitted). An "interrogation" has been defined as "(a) conduct intentionally designed to evoke a confession, as well as (b) any conduct an officer should reasonably have foreseen would elicit an inculpatory response." *United States v. Bonner*, 469 Fed. Appx. 119, 126 (3d Cir. 2012) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301-02 (1980)).

"Once a defendant challenges the admissibility of any statements made while in custody, the government must prove [by a preponderance of the evidence] that the defendant was advised of and understood [his] *Miranda* rights and that he [] validly waived those rights." *United States v. Briscoe*, 69 F. Supp. 2d 738, 741 (D.V.I. 1999), *aff'd in part, rev'd in part on other grounds*, 234 F.3d 1266 (3d Cir. 2000). "The Supreme Court has characterized this as a 'heavy burden.'" *United States v. Boyce*, 2015 WL 856943, at *7 (D.V.I. Feb. 26, 2015) (citing *Miranda,* 384 U.S. at 475); *see also North Carolina v. Butler*, 441 U.S. 369, 373 (1979) (stating that "the prosecution's burden is great"). A person may "waive effectuation of these [*Miranda*] rights, provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444; *see also United States v. Stuckey,* 441 F.2d 1104, 1105 (3d Cir. 1971).

Two factors affect the determination whether *Miranda* rights have been voluntarily, knowingly, and intelligently waived:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the *"totality of the circumstances"* surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine,* 475 U.S. 412, 421 (1986) (internal citation omitted) (emphasis added). Specifically, in analyzing the totality of the circumstances, courts must consider "the background, experience, and conduct of the [defendant], as well as any indicia of coercion." *Briscoe*, 69 F. Supp. 2d at 741 (citing *Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983)). "Examples of 'traditional' indicia of coercion are 'the duration and conditions of detention, the attitude of the interrogators, defendant's physical and mental state, and other pressures affecting defendant's powers of resistance and self-control.'" *United States v. Rose*, 189 F. Supp. 3d 528, 536 (D.V.I. 2016) (quoting *Briscoe*, 69 F. Supp. 2d at 741 n. 1). Another important factor that may impact voluntariness is the defendant's familiarity with the criminal justice system, *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005), wherein a defendant with experience with the criminal justice system precludes a showing that he is "dumb as to [his] rights." *United States v. Durham*, 741 F. Supp. 498, 505 (D. Del. 1990) (quoting *Miller v. Fenton*, 796 F.2d 598, 606 n. 8 (3d Cir. 1986)). But, "a necessary predicate to a finding of involuntariness is coercive police activity. Further there must be some causal connection between the police conduct and the confession." *Jacobs*, 431 F.3d at 108 (internal citation omitted); *Connelly,* 479 U.S. at 164 (a statement is involuntary if it is the product of overreaching police conduct).

Meanwhile, the Supreme Court has long established that "the search of property, without warrant and without probable cause, but with proper consent voluntarily given, is valid under the Fourth Amendment." *United States v. Matlock,* 415 U.S. 164, 165–66 (1974). As with a *Miranda* waiver, "the Government bears the burden of proving by a preponderance of the evidence that the search was made pursuant to a voluntary consent." *United States v. Cabrera*, 2007 WL 1575014, at *2 (M.D. Pa. May 31, 2007) (citing *United States v. Velasquez,* 885 F.2d 1076, 1081 (3d Cir.1989)). The determination of whether a consent to search was made voluntarily is based on analyzing the "totality of the circumstances, including the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment.'" *United States v. Mendoza*, 334 F. App'x 515, 517 (3d Cir. 2009) (internal citation and quotation marks omitted); *see also United States v. Ortiz*, 483 F. App'x 712, 716 (3d Cir. 2012) (same). "Also relevant is the setting in which the consent was obtained and the parties' verbal and non-verbal actions." *United States v. Kellam*, 2015 WL 6560637, at *6 (M.D. Pa. Oct. 29, 2015) (citing *United States v. Givan,* 320 F.3d 452, 459 (3d Cir.2003)). The issue of coercion is also key because "[f]undamental to the concept of voluntariness is that consent must not be coerced." *Kellam*, 2015 WL 6560637 at *6 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973)). Further, the Third Circuit has long established that "[w]here a person is under arrest or in custody and consent to search is sought by police, the rule has emerged [], . . . that absent proof of actual coercion or intimidation such consent constitutes a valid waiver of Fourth Amendment rights if prior to the search, Miranda warnings are given. Moreover, these cases are clear that the validity of this waiver is not affected by a failure to include in the Miranda warnings a specific reference that consent could be withheld." *United States v. Phifer*, 400 F. Supp. 719, 732 (E.D. Pa. 1975), *aff'd,* 532 F.2d

748 (3d Cir. 1976) (listing cases). In other words, "the Fourth Amendment does not require that the Government advise a suspect of his right to refuse consent before requesting such consent." *United States v. Himmelreich*, 2006 WL 1722399, at *5 (M.D. Pa. June 16, 2006), *aff'd*, 265 F. App'x 100 (3d Cir. 2008).

## III.    DISCUSSION

Williams asserts that his waiver of *Miranda* rights and his consent to search his cell phone were not made knowingly and voluntarily. (Dkt. No. 94 at 3). Specifically, Williams argues that the threat made against him,—i.e., that he would go to jail if he did not sign the forms—and the fact that he was shackled prior to the interrogation, are indicia of coercion and proof that his waiver and consent to search were not voluntarily given. *Id*. at 3. Williams also contends that his background at the time—i.e., that he had only turned 18 years old just before his arrest and that he had never been arrested before—and the fact that he was detained for hours contributed to his inability to make a knowing and voluntary waiver and consent to search. *Id*. at 5. Accordingly, Williams seeks to suppress any statements he made to law enforcement, as well as any search of his cellphone. *Id*.[4]

The Government disagrees and argues that the circumstances surrounding Williams' arrest and interrogation clearly establish that his waiver of *Miranda* rights and consent to search were made knowingly and voluntarily. (Dkt. No. 96 at 18-20). The Government asserts that, after his

---

[4] In Williams' Motion to Suppress, he originally stated that he "adopts arguments and statements made by his co-defendant," (Dkt. No. 28 at 1), referring to the Omnibus Motion filed by Greyham on May 8, 2017 (Dkt. No. 26). Therefore, during the suppression hearing, the Court considered and incorporated arguments from the Omnibus Motion where it considered them relevant. However, in his "Post-Hearing Memorandum" (Dkt. No. 94), Williams withdrew two of the three arguments he had previously raised, including that: 1) Agent Cardona had no legal authority to search and seize Williams and 2) because evidence was allegedly seized in violation of Greyham's *Miranda* rights, that evidence should be suppressed against Williams. *Id*. at 2. Because Defendant withdrew the arguments, the Court will not address them.

arrest, Williams was read his rights and he signed a waiver indicating that he understood his rights and that he was willing to speak with Agent Cardona without a lawyer. *Id*. at 19. The Government further argues that Williams never indicated to Agent Cardona that he did not understand what was going on while he was interrogated. *Id*. Moreover, according to the Government, the interview was conducted with no "coercion, no guns trained on the defendant or a hostile atmosphere," and Williams was not handcuffed while he was interviewed. *Id*. The Government also contends that Williams voluntarily signed the consent form allowing officers to search his cell phone. *Id*. Finally, the Government contends that Williams' testimony that he asked the agents if it was mandatory for him to sign the forms and was told that it was or he would go to jail is in "stark contrast" to Agent Cardona's testimony. *Id*. 19-20. Accordingly, the Government argues that it has sufficiently established that, under the totality of the circumstances, Williams' *Miranda* waiver and consent to search were given knowingly and voluntarily, and thus his statements and the search of his cell phone should not be suppressed. *Id*. at 20.

The parties do not dispute that Williams was subject to a custodial interrogation pursuant to *Miranda* when Officer Cardona interviewed him on March 10, 2017. Nor does Williams dispute that a Miranda waiver and a consent to search form were provided to him. (Dkt. No. 94 at 3). Instead, Williams argues that neither his waiver nor his consent to search were given knowingly and voluntarily because he primarily alleges that he was threatened by a male officer that signing both documents were mandatory or he would go to jail. Agent Cardona denies that he made such a statement. Thus, the issues presented here are whether Williams waived his *Miranda* rights "voluntarily, knowingly, and intelligently," *Stuckey,* 441 F.2d at 1105, [5] and whether his consent

---

[5] Williams frames the issue in his "Post-Hearing Memorandum" in terms of whether his statements were voluntary. (Dkt. No. 94 at 2-5). The Court views the issue in terms of the voluntariness of his waiver of his *Miranda* rights because a "[defendant's] statements are admissible [] if he validly

to search his phone was given voluntarily.

## A.     Miranda Waiver and Consent to Search

### 1.     Conflicting Testimony and Credibility Determination

In view of the conflicting testimony between Agent Cardona and Williams regarding the threat allegedly made against the latter, the Court is required to make a credibility determination. *See United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) ("[A]t a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge") (internal citations and quotation marks omitted). "The Court judges credibility by considering a number of factors, including the witness's demeanor and manner on the stand, his ability to accurately recollect the matters at hand, the manner in which he may be affected by the outcome, the extent to which his testimony is either supported or contradicted by other evidence and testimony in the case, and whether it withstands the 'common sense test.'" *United States v. Davis*, 2014 WL 1394304, at *3 (W.D. Pa. Apr. 9, 2014) (citing *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005)); *United States v. Demings*, 787 F. Supp. 2d 320, 326 (D.N.J. 2011) (citing same). "[A] witness should not be considered any more or less credible because the witness is a law enforcement officer." *United States v. Graham*,

---

waived his *Miranda* rights after receiving the advisement." *United States v. Scotland*, 2014 WL 2149644, at *3 (D.V.I. May 22, 2014). In any event, "[t]he criteria for assessing the voluntariness of [Defendant's] waiver of his *Miranda* rights are the same for determining the voluntariness of statements generally." *Briscoe,* 69 F. Supp. 2d at 742. "The Court again looks to the totality of the circumstances: a statement made in response to coercive or deceptive police activity may be considered involuntary." *Scotland*, 2014 WL 2149644 at *4 (citing *Withrow v. Williams,* 507 U.S. 680, 693 (1993) and *Culombe v. Connecticut,* 367 U.S. 568, 602 (1961)); *United States v. Latz*, 162 F. App'x 113, 118 (3d Cir. 2005) ("a statement is involuntary when the suspect's 'will was overborne in such a way as to render his confession the product of coercion.") (internal citations and quotation marks omitted).

2014 WL 3396495, at *4 (D.N.J. July 9, 2014) (citing *United States. v. Bethancourt*, 65 F.3d 1074, 1080 (3d Cir.1995)).

The Court credits Agent Cardona's testimony concerning how the *Miranda* waiver was presented and discussed with Williams, including his denial that Williams was threatened with jail if he did not sign the *Miranda* waiver and Consent Form. First, based on the Court's observation during the suppression hearing, Agent Cardona's demeanor on the stand was calm and collected, as he recounted events in an organized and cogent manner. Agent Cardona's demeanor remained the same even as Defense counsel challenged his version of events. *See Murphy*, 402 F. Supp. 2d at 570-71 (finding defendant credible in part because "even upon vigorous and effective cross-examination by the [government], his version of the events of that evening never wavered").

Second, Agent Cardona was able to recall the matter at hand in considerable detail, demonstrating a clear and consistent recollection of events. *Cf. United States v. Jackson*, 560 F. Supp. 2d 331, 336 (D. Del. 2008) (finding the officers' testimonies during the suppression hearing not credible due to inconsistencies). In contrast, the Court observed that Williams' testimony began with considerable detail—details which in fact corroborated Agent Cardona's testimony of the events of that day—and then eroded when it came time to discuss some of the details surrounding the interview—including the critical question of who allegedly told him that if he did not sign the forms, he would go to jail. The Government questioned Williams several times about who told him this, and Williams' answers were replete with lack of memory for such a significant issue in this incident.

Williams testified, *inter alia*, that he simply could not remember because it happened more than a year ago and there were, according to him, three or four people in the room during his interview. The Court notes that while Williams was able to recall that it was Agent Cardona who

approached the vehicle in the morning, and that none of the law enforcement officers who escorted him around the Federal Building that day was Agent Cardona, Williams could not remember whether it was Agent Cardona who sat next to him during his interview, gave him the forms, and discussed his *Miranda* rights and Consent Form to search his phone with him, notwithstanding that the interview lasted at least an hour. Nor could he remember—most significantly—who created the allegedly coercive atmosphere by threatening jail if he did not sign the forms.[6] In light of Williams' lack of recall on central points surrounding the interview, together with the fact that he signed forms that explicitly represented that no threats were made to him, *see* Government Exs. Nos. 1 and 2, the Court does not deem Williams' testimony on the disputed issues credible— including the alleged threat that signing the *Miranda* waiver and Consent Form was mandatory or he would go to jail. *See United States v. Boyce*, 2015 WL 856943, at *8 (D.V.I. Feb. 26, 2015) (finding "defendant's selective memory and inconsistent testimony on salient points demonstrates his lack of credibility").

Third, Agent Cardona has an interest in the outcome of the proceeding from a professional perspective because of his work on the case. Similarly, Williams—whose liberty is at stake— clearly has a substantial personal interest in the outcome of this matter. The Court recognizes, however, that while "[d]efendants in criminal cases always have much riding on the outcome . . .

---

[6] Williams was able to recall that there were at least two males and one female present when he entered the interview room and when he was signing the papers. He later testified that "two of them left and came back and one extra came in the room." He then stated that when he signed the *Miranda* waiver, there were "three or four of them [i.e., law enforcement officials] in the room." As the record demonstrates, one of the officers was female, and one of the male officers was Agent Cardona. Agent Cardona reported that the other person in the room during Williams' interview was Agent DiFranco. Williams apparently had no recollection of whether it was Agent Cardona or the other male officer—or one of the other two male officers if Williams' testimony that there were four officers in the room is credited—who allegedly threatened him with jail.

it would be manifestly unfair and highly improper for that overtly or subliminally to be the determinative factor in judging a defendant's testimony. All of the circumstances must be considered and a credibility determination arrived at based on reason and logic." *Murphy*, 402 F. Supp. 2d at 571. Consistent with this approach and as discussed herein, it is the combination of factors that undergirds the Court's conclusion as to the credibility of Agent Cardona's testimony and Williams' lack of credibility on the disputed points.

Finally, other evidence from the hearing supports Agent Cardona's testimony and his depiction of events "withstands the common sense test." *Davis*, 2014 WL 1394304 at *3. Agent Cardona testified that he was the investigating officer in this matter. He also testified that he provided Williams with the waiver and Consent Form, read both documents to him, and asked him to read them for himself and to indicate he understood what was read by initialing and signing the forms. The exhibits support Agent Cardona's testimony. The *Miranda* waiver bears both Williams' and Agent Cardona's signatures, with Agent Cardona as the signing officer.[7] Williams' initials appear at the beginning of each sentence on the *Miranda* waiver, indicating he read and understood each *Miranda* warning, including those that confirmed he had a right to remain silent, have an attorney to him, and that he was willing to waive these rights and speak with Agent Cardona. This documentary evidence lends credibility to Agent Cardona's testimony that he presented the forms to Williams and discussed them with him. *Cf. Davis*, 2014 WL 1394304 at *5 (finding that the detective's testimony was not credible because it failed the common sense test by being inconsistent and not reasonable in the face of the record).

In view of all the foregoing, the Court finds Agent Cardona's testimony credible. Agent

---

[7] The Consent Form also bears Williams' signature, but does not have a place for the officer to sign.

Cardona's credibility, when contrasted with Williams' lack of recall of significant details surrounding his interview, convinces the Court to credit Agent Cardona's testimony that he did not tell Williams it was mandatory for him to sign the waiver and Consent Form or else he would go to jail. *See Boyce*, 2015 WL 856943 at *8 ("'At a suppression hearing . . . the Court determines the credibility of witnesses and may accept or reject any or all of a witness' testimony'") (internal citation omitted).

### 2. Voluntary, Knowing, and Intelligent Waiver of Defendant's *Miranda* Rights

Having determined that Agent Cardona's testimony is credible, we must next consider whether, under the totality of the circumstances, the Government has shown by a preponderance of the evidence that Williams' waiver of his *Miranda* rights was made "knowingly, voluntarily, and intelligently." *Stuckey,* 441 F.2d at 1105. Based on the evidence presented, the Court answers this question in the affirmative.

First, as discussed above, the Court finds Agent Cardona's testimony to be credible pertaining to his presentation of the *Miranda* waiver to Williams. Thus, the Court credits Agent Cardona's testimony that he read the form to Williams; that Williams read the form himself; and that Williams initialed the form as he read through it. Further, Williams himself testified that he was not "forced" to sign the waiver. Moreover, both Agent Cardona and Williams testified that Williams never indicated that he did not understand what was going on. Nor was there anything else in the record which suggests that Williams' ability to understand what was happening may have been impaired. Indeed, the evidence shows that Williams confirmed that he understood his rights by initialing the handwritten answer "Yes" to the questions, "Do you understand your rights?" and "Are you willing to waive these rights and talk to me?" *See* Government Ex. No. 1. By his signature, he also affirmed that: "I have read this statement of my rights and I understand

what my rights are." *Id*. Williams "has neither undermined that [evidence] nor provided independent evidence to the contrary." *United States v. Brown*, 2013 WL 124280, at \*8 (D. Del. Jan. 8, 2013), *aff'd,* 565 F. App'x 98 (3d Cir. 2014).[8] These circumstances support a finding of a voluntary waiver. *See e.g., United States v. Herrera-Genao*, 419 Fed. Appx. 288, 292-93 (3d Cir. 2011) (upholding district court's finding that defendant was properly advised of his *Miranda* rights where there was testimony that "[defendant] was brought to interrogation, verbally advised as to his *Miranda* rights, and then given a Statement of Rights, which he reviewed and signed"); *United States v. Andrews*, 231 Fed. Appx. 174, 176–77 (3d Cir. 2007) (finding defendant's statements voluntary when police advised defendant of his *Miranda* rights, gave defendant a written copy of the *Miranda* warnings, and prompted defendant to read portions of the warnings aloud and write his initials after each warning); *Alston*, 34 F.3d at 1253 (finding that defendant "understood his *Miranda* rights when he signed the waiver," based on defendant's execution of the form "and the testimony of the interrogating officers concerning their recitation of the rights and [defendant's] acknowledgement that he understood them"); *United States v. Velasquez,* 626 F.2d 314, 320 (3d Cir.1980) (providing that a defendant who answers questions after being advised of her rights may be deemed to have waived her rights).

Second, as previously discussed, the Court does not credit Williams' assertion that he was told that signing the waiver was mandatory or he would go to jail. Further, Agent Cardona testified that the interview took place in a conference room in a professional atmosphere. Agent Cardona also testified that none of officers had their guns drawn; that Williams was not forced to answer

---

[8] Williams' bare assertion at the suppression hearing that he did not understand everything on the paper, but only certain parts of it—without any indication of what was not understood and why— falls short of providing any meaningful challenge to Agent Cardona's testimony and the supporting documentary evidence, or providing contrary independent evidence.

questions; that no one shouted at Williams; that Williams never told any of the officers he did not want to talk; and that none of the officers physically punished Williams. Moreover, Agent Cardona confirmed that Williams was not handcuffed during the interview. Nor is there anything in the record to suggest that Williams' interview was overly long or any evidence that there was "[] repeated or prolonged questioning of Defendant[.]" *United States v. Harris*, 2013 WL 1828549, at *16 (W.D. Pa. Apr. 30, 2013). Instead, Agent Cardona testified that he commenced Williams' interview at approximately 1:00 p.m. and the exhibits show that Williams signed the Miranda waiver and Consent Form at 1:19 p.m. and 1:53 p.m., respectively, thus suggesting that the interview was not prolonged. In addition, the waiver section of the *Miranda* form, which Williams signed, contained the statement, "no pressure or coercion of any kind has been used against me." Government Ex. No. 1.

Considering all these circumstances, the Court finds that Williams was not coerced to waive his *Miranda* rights. *See e.g., United States v. Granado*, 2012 WL 12888670, at *2, 7 (E.D. Pa. Feb. 9, 2012), *aff'd,* 523 F. App'x 153 (3d Cir. 2013) (finding that defendant's *Miranda* waiver and his subsequent statements to law enforcement officials were "not tainted by any coercive police action," where, *inter alia*, defendant's interviews took place in an interview room, the officers "did not display any hostility, nor did they threaten, assault, or direct any violence against [defendant]," and the interviews defendant was subjected to were "relatively short," i.e., between an hour and two hours); *United States v. Augusta*, 2018 WL 317972, at *4-5 (M.D. Pa. Jan. 8, 2018) (finding that defendant's waiver of his *Miranda* rights was voluntary where, *inter alia*, there was no evidence that defendant was "verbally or physically threatened, deceived, or otherwise coerced into waiving his *Miranda* rights by the interviewing agents . . . [officers'] guns were holstered during the course of the interview . . . [defendant] was advised of his rights and

questioned in a civil, cordial, and conversational tone," and where defendant's questioning lasted approximately an hour) (internal quotation marks omitted); *United States v. Whitfield*, 2013 WL 1905112, at \*2-3 (E.D. Pa. May 8, 2013) (finding that defendant's *Miranda* waiver was made voluntarily where, *inter alia*, defendant's custodial interrogation lasted only approximately 45 minutes and where defendant did not indicate "he did not understand the rights of which he was advised").

To prove a valid *Miranda* waiver, the Government also bears the burden of proving Williams waived his rights "knowingly" and "intelligently," i.e., that he understood his *Miranda* rights and the consequences of waiving them. *Colorado v. Spring*, 479 U.S. 564, 574 (1987). Williams contends that he had only "turned eighteen approximately four months before" this incident and that he "had never been arrested before." (Dkt. No. 94 at 5). Williams also testified that he never graduated from high school or completed job corps. The Court finds that these factors do not render Williams' *Miranda* waiver involuntary.

Here, under the totality of the circumstances, the Court finds that nothing in Williams' "background, experience, intelligence . . . and conduct" suggests that he did not understand his *Miranda* rights or the consequences of waiving them. *Scotland*, 2014 WL 2149644 at \*3 (citing *Moran,* 475 U.S. at 421); *see also Patterson v. Ill.*, 487 U.S. 285, 294 (1988) (finding that reading an accused his *Miranda* warnings provides the accused with knowledge of the consequences of waiving these rights); *United States v. Phuong Le*, 2011 WL 913260, at \*3 (E.D. Pa. Mar. 11, 2011) ("If the totality of the circumstances surrounding the interrogation demonstrates that the defendant had the required level of comprehension, a court may properly conclude that the waiver was knowing and intelligent."). Indeed, by his signature on the *Miranda* waiver form, Williams affirmed that: "I understand and know the consequences of what I am doing." Government Ex.

No. 1.

Further, although eighteen is, admittedly, a young age, and Williams is not a high school graduate, there is no evidence or suggestion in the record that Williams was mentally deficient so as to even raise a question as to his mental capacity, let alone to conclude that his mental capacity was so deficient as to have rendered him incapable of understanding Agent Cardona when he was read his rights. *See United States v. Richardson*, 265 F. App'x 52, 55-56 (3d Cir. 2008) (affirming district court's finding that defendant waived his *Miranda* rights voluntarily, knowingly, and intelligently where "there is no evidence to support a finding that he did not have the requisite level of comprehension to understand his waiver," despite the fact that defendant had a low IQ, learning disabilities and attended special education classes.); *Henderson v. Hendricks*, 2005 WL 3406434, at *10 (D.N.J. Dec. 13, 2005) (finding that defendant validly waived his *Miranda* rights where "there were no factors concerning [defendant's] age, mental condition, or education, suggesting that he did not understand his *Miranda* rights or the consequences of waiving those rights.").

Williams also argues that because he has never been arrested before, he does not possess the requisite knowledge about the criminal justice system, implying that this renders his statements involuntary. (Dkt. No. 94 at 5). Although Williams' familiarity with the justice system is a factor that a court should consider as to whether his statements were made voluntarily, *see Jacobs*, 431 F.3d at 108, there is no indication here that Williams' lack of experience with the criminal justice system prevented him from understanding what was happening and what was being said to him. *United States v. Vega-Arizmendi*, 2017 WL 132844, at *10 (D.V.I. Jan. 12, 2017). While Williams testified during his cross-examination at the suppression hearing that he signed the *Miranda* waiver understanding only "certain parts of it," Agent Cardona testified—as acknowledged by

Williams—that, after presenting the form to Williams and reading it to him, and after Williams reviewed the form for himself and signed it, Williams at no point informed Agent Cardona or anyone else that he did not understand what was going on. Further, the waiver form admitted into evidence does not contain complicated legal language. Here, the *Miranda* form stated Williams' rights in plain language, and asked these questions: "Do you understand your rights?" and "Are you willing to waive these rights and talk to me?" *See* Government Ex. No. 1. Williams initialed on the handwritten answer "Yes" to both questions and proceeded to speak with Agent Cardona, thereby giving every indication that he understood the contents of the form. By signing the form, Williams also affirmed that he understood his rights. *See* Government Ex. No. 1 ("I understand what my rights are."). Consequently, the Court cannot give credence to Williams' self-serving and uncorroborated testimony given at the suppression hearing that he did not understand "everything in [these] paper[s]." *See Whitfield*, 2013 WL 1905112 at *2 (E.D. Pa. May 8, 2013) (finding that defendant knowingly waived his *Miranda* rights in part due to the "plain, simple language on the pre-printed 'Advice of Rights and Waiver' form, which [defendant] signed").

Finally, Williams argues that his prolonged detention prior to being interviewed also contributed to the involuntary nature of his *Miranda* waiver. (Dkt. No. 94 at 4-5). Williams reported that while the incident occurred around 9:30 a.m., he was not interviewed until hours later—at approximately 1:00 p.m. Williams also contends that throughout his detention, he was placed in restraints that were removed only prior to being taken into the interview room. *Id*. at 5.

The Court finds that while there is "admittedly [] some measure of compulsion inherent in custody itself . . . the totality of the circumstances here reveal[s] no indicia of involuntariness." *United States v. Bass*, 2017 WL 1027027, at *6 (D.V.I. Mar. 15, 2017). The fact that Williams was arrested at approximately 9:30 a.m. and was not interviewed until about three and half hours later

does not demonstrate such an unreasonable delay as to suggest "coercive police activity." *Jacobs*, 431 F.3d at 108. Agent Cardona testified that he spent this period furthering his investigation into the matter, including identifying and tracking down the owner of the vehicle. *See United States v. Carney*, 328 F. Supp. 948, 956 (D. Del. 1971), *aff'd,* 455 F.2d 925 (3d Cir. 1972) (finding that where defendants were arrested, detained, and their interviews did not conclude until almost more than two hours after their arrest, the circumstances were not sufficient to show that it was "for the purpose of extracting inculpatory statements from them . . . or [to] give an unnecessary opportunity [] for the extraction of a confession."). Moreover, the fact that Williams was restrained while he was detained, although not during his interview, is also not determinative of coercion. Placing a suspect in restraints while in custody is not unusual police activity. Indeed, even being in restraints *during questioning*—unlike the situation here—is not necessarily indicative of coercion for purposes of assessing the voluntariness of waivers. *See e.g., United States v. Lee*, 2008 WL 1901408, at *2-3 (W.D. Pa. Apr. 25, 2008) (finding that defendant's waiver and statements made voluntarily despite defendant being shackled at table in the interview room during his interview). The fact here—as even Williams acknowledges—is that he was *not* restrained during his interview with Agent Cardona. The *absence* of restraints during the interview—notwithstanding their presence while Williams was detained—does not support a finding that Williams was coerced into signing the *Miranda* waiver.

In view of all of the foregoing, the Court concludes that the Government has shown by a preponderance of the evidence that Williams' *Miranda* waiver was made "knowingly, voluntarily, and intelligently." *Stuckey,* 441 F.2d at 1105. Accordingly, Williams' Motion to Suppress the statements that he made during his interview with Agent Cardona will be denied.

### 3.  Consent to Search Cell Phone

The Court will now address Williams' argument that he did not voluntarily consent to the search of his cell phone. The Court will address this briefly as many of the factors determining voluntariness of consent are similar to those analyzed under the voluntariness of a *Miranda* waiver already discussed above. *Compare Briscoe*, 69 F. Supp. 2d at 741, *with Mendoza*, 334 F. App'x at 517–18. Based on the totality of the circumstances, the Court concludes that the Government has shown by a preponderance of the evidence that Williams' consent to search his cell phone was voluntary.

The evidence of record supports the Court's conclusion. As presented, the evidence revealed that there was no use of physical punishment; the interview took place in a professional atmosphere; officers did not have their guns drawn; Williams was not handcuffed or otherwise physically restrained during the interview; and there was no prolonged questioning of Williams. The testimony of Agent Cardona, which the Court found credible, described how, after being presented with his *Miranda* waiver, the Consent Form was subsequently read to Williams; Williams read the form himself; and Williams signed the Consent Form and drew his password on the form to allow the officers to search his phone. In fact, Williams testified that he was not "forced" to sign the form, and affirmed by his signature on the form that "no promises, threats, force, physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search of the mobile telephone(s)." Government Ex. No. 2. Further, for reasons similar to those stated above, there is no evidence suggesting that Williams' age, intelligence, or educational background rendered his consent involuntary. Although Williams did not have to be informed that he could refuse consent, *Himmelreich*, 2006 WL 1722399 at *5, the form that he signed stated explicitly: "I understand that I have the right to refuse the consent to search described

above and to refuse to sign this form." *See* Government Ex. No. 2.

Finally, Williams, who had already been placed under arrest and was in custody, was advised of his constitutional rights via the *Miranda* waiver prior to being presented with the Consent Form—and signed both the *Miranda* waiver and the Consent Form—thus constituting a "valid waiver of [his] Fourth Amendment rights." *Phifer*, 400 F. Supp. at 732 (E.D. Pa. 1975) (finding that defendant provided consent to search voluntarily after being placed under arrest and given *Miranda* warnings, where there was no evidence "of any intimidation, physical or psychological abuse, threats or coercion tending to show that [defendant's consent] was not freely and voluntarily given. Moreover, there is nothing in the record to show that the DEA agents used any tactics that would augment the degree of coercion that is inherent in any arrest."). *See also Ortiz*, 483 F. App'x at 716 (finding that defendant provided his consent to search voluntarily where he, *inter alia*, was arrested, handcuffed, had his *Miranda* rights and the consent form read to him by the officers, indicated that he understood that officers sought his permission to search his house, treated in a courteous manner by officers, and had no prolonged encounter with law enforcement); *Mendoza*, 334 F. App'x at 517–18 (finding that defendant provided his consent to search his vehicle and residence voluntarily despite being handcuffed and detained by officers approximately an hour and fifteen minutes, where defendant was given his *Miranda* warnings, was not subjected to prolonged or repeated questioning, was treated in a professional and courteous manner by the officers, and was of age to voluntarily consent); and *Kellam*, 2015 WL 6560637 at *2 (finding that defendant, who had been arrested and taken into custody, voluntarily consented to a search of his residence where he was provided with his *Miranda* rights, he indicated that he understood those rights, and there was no evidence that defendant's age, intelligence, or educational background rendered his consent involuntary). Accordingly, as with his waiver of *Miranda* rights, the Court

finds that Defendant voluntarily consented to the search of his cell phone.

### IV.    CONCLUSION

In view of the foregoing, the Court concludes that the Government has shown by a preponderance of the evidence that Williams' *Miranda* waiver was made "knowingly, voluntarily and intelligently," *Stuckey,* 441 F.2d at 1105, and his consent to search his cell phone was made voluntarily. *Matlock,* 415 U.S. at 165. Accordingly, the Court will deny Williams' Motion to Suppress.

An appropriate Order accompanies this Memorandum Opinion.

Date: October 2, 2018                                   _____/s/_____
                                                         WILMA A. LEWIS
                                                         Chief Judge